T.C. Memo. 1998-132


UNITED STATES TAX COURT


BRUCE AND JEANNE KORSON, ET AL.[1], Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 18976-96,                         Filed April 6, 1998.
          18977-96,
          18978-96.


          R determined deficiencies in income tax on account
of R's revaluation of certain numismatic materials
contributed to charity; Ps claim an overpayment on
account of their own, subsequent revaluation.
          <u>Held</u>: Deficiencies sustained in part.  <u>Held</u>,
<u>further</u>, no overpayments made.


          <u>Sidney D. Rosoff</u> and <u>Paula G.A. Ryan</u>, for petitioners.

          <u>Mark A. Ericson</u> and <u>Laurence D. Ziegler</u>, for respondent.

----

[1]     The following cases are consolidated for trial, briefing,
and opinion:  Armin B. Allen, docket No. 18977-96; John H. Allen
and Susan N. Allen, docket No. 18978-96.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined deficiencies in income tax and additions to tax as follows:

|  | Year | Deficiency | Additions to Tax Sec. 6651(a)(1) |
|---|---|---|---|
| Bruce and Jean Korson | 1991 | $10,000 | $396 |
| Armin B. Allen | 1991 | 5,484 | -- |
| John H. and Susan N. Allen | 1991 | 9,415 | -- |

Petitioners have assigned error to respondent's determinations and, in addition, have claimed overpayments in tax.

Petitioners Bruce and Jeanne Korson concede the section 6651(a)(1) addition to tax, and the only other issue for decision, common to all petitioners, is the fair market value of certain property contributed to charity.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.  At the time the petitions in these cases were filed, petitioners Bruce and Jeanne Korson resided in Oyster Bay Cove, New York, petitioner Armin B. Allen

resided in Newport, Rhode Island, and petitioners John H. and Susan N. Allen resided in New York, New York.

Virgil M. Brand

Virgil M. Brand (Virgil Brand) was a coin collector who, during the late 19th and early 20th century, amassed the largest and one of the most significant private coin collections in the United States (the coin collection).  Virgil Brand died intestate in 1926, and his brothers, Armin Brand (Armin) and Horace Brand (Horace) succeeded to his estate.  Armin and Horace each received half of Virgil Brand's original bound coin ledgers (the coin ledgers), which, to a large extent, recorded Virgil Brand's coin acquisitions.  Additionally, each received a reverse (white on black) photocopy of reduced size of the coin ledgers received by the other brother (collectively, the photocopy).  Armin also inherited certain papers relating to the Chicago Coin Co. (the Chicago Coin Co. papers), a company that was either owned or co-owned by Virgil Brand and that was engaged in the coin business, and certain coin envelopes.

Jane Brand Allen

Armin died in 1946.  His only child, Jane Brand Allen (Jane Allen), inherited Armin's half of the coin ledgers and photocopy, the Chicago Coin Co. papers, the coin envelopes, papers relating to Virgil Brand's estate (the Virgil Brand estate papers) along with papers relating in part to Armin's dispersal of some of the

coin collection (Armin's papers).  Jane Allen died testate in 1981 and her children, petitioners Jeanne Korson, Armin B. Allen, and John H. Allen (collectively, the children), received those ledgers, items, and papers by devise.  The children also received papers that their mother compiled, some of which relate to her dispersal of some of the coin collection (the Jane Allen papers).  Each of the children was a co-executor of Jane Allen's estate (the estate).  A Federal estate tax return was filed on behalf of the estate and each of the children signed that tax return.  That return did not include Armin's half of the coin ledgers, Armin's half of the photocopy, the Chicago Coin Co. papers, the coin envelopes, the Virgil Brand estate papers, Armin's papers, or the Jane Allen papers as assets of the estate because none of the children believed that those items had any market value.

Jane Allen's estate also included part of the coin collection.  The executors of the estate devised a marketing plan in an attempt to maximize the value of those coins.  They decided to promote Virgil Brand's name in order to develop his identity as a unique numismatic collector and to publicize his life as well as the coin collection.  To that end, the executors arranged to have a book published in 1983 that profiled Virgil Brand and the coin collection.

## The Brand Archive

On August 13, 1983, petitioners bought Horace's half of the coin ledgers, Horace's half of the photocopy, and a reverse photocopy of the Chicago Coin Co. papers at a public auction for $22,550. The coin ledgers, the photocopy, the Chicago Coin Co. papers, the Virgil Brand estate papers, Armin's papers, the Jane Allen papers, and various coin envelopes collectively constitute the Brand Archive (Brand Archive).

## The Contribution

Petitioners contributed the Brand Archive (the contribution) to the American Numismatic Society on September 3, 1991 (the contribution date). On their respective 1991 Federal income tax returns, each of the children claimed a $58,333.33 charitable contribution deduction on account of the contribution which represented one-third of the claimed value of the Brand Archives ($175,000). Respondent determined that the fair market value of the Brand Archive on the contribution date did not exceed $75,000 and disallowed each of the claimed deductions to the extent that it exceeded $25,000.

## Ultimate Finding of Fact

On the contribution date, the fair market value of the Brand Archive was $142,650.

OPINION

## I.  Introduction

These consolidated cases involve income tax deductions claimed on account of charitable contributions.  The particular question before us is the value of certain numismatic materials (the Brand Archive) contributed to the American Numismatic Society on September 3, 1991.  Petitioners claim that the fair market value of the Brand Archive on the contribution date was $605,000, while respondent claims that its fair market value did not exceed $75,000.  Value is a question of fact, and petitioners bear the burden of proof.  Rule 142(a).  We have found that the fair market value of the Brand Archive on the contribution date was $142,650.

## II.  Code and Regulations

Section 170(a)(1) allows a deduction for any contribution made to a qualified donee organization.  It is undisputed that the American Numismatic Society is a qualified donee organization, and the only question before the Court is the amount of the contribution on the contribution date.  The parties agree that each of the children was entitled to deduct one-third of the fair market value of the Brand Archive on the contribution date.  With exceptions not here relevant, if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution.  Sec. 1.170A-1(c)(1), Income Tax Regs.

"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.

III. Value of the Contribution

A. Introduction

To support their respective valuations, the parties rely principally on the testimony of expert witnesses. We have considered that testimony and, in part, have relied on it in making our finding.

B. Petitioners' Expert

1. Gabriel Austin's Testimony

Gabriel Austin (Austin), petitioners' expert witness, is an appraiser and cataloguer who was accepted by the Court as an expert in the valuation of archives, books, and manuscripts. Austin prepared a written report for submission to the Court as his expert testimony (the Austin report). In the Austin report, Austin expresses separate opinions as to the values on the contribution date of (1) the coin ledgers, (2) the Chicago Coin Co. papers, (3) the Virgil Brand estate papers, (4) Armin's papers, and (5) the Jane Allen papers. Based on Austin's failure to comply fully with the standards of Rule 143(f) with respect to expert witness reports, those portions of the Austin report expressing opinions as to the values of the Virgil Brand estate

papers, Armin's papers, and the Jane Allen papers were excluded from evidence. The remaining portion of the Austin report was received into evidence as Austin's expert testimony. Austin is of the opinion that, on the contribution date, the coin ledgers and the Chicago Coin Co. papers had fair market values of $450,000 and $20,000, respectively.

To value the coin ledgers and the Chicago Coin Co. papers, Austin looked for sales of comparable items to use in estimating both items' fair market value. Austin found two sales at auction of items that he asserts were only "quasi-comparables". Austin prefers not to rely on auction sales to value archival material because he believes auction prices are not necessarily good indicators of value. He prefers to rely instead on private sales, but, since records of such sales were not available to him, and due to the uniqueness of the Brand Archives, he could not do so.

Austin finds that the most useful public record in arriving at a value of the Brand Archive is the price paid by petitioners for Horace's half of the coin ledgers and accompanying half of the photocopy. Petitioners purchased those items at public auction in 1983 for $22,550. Austin believes that the amount that would have been realized at that auction had the lot contained the full set of coin ledgers would have been "triple". He also believes that $22,550 was an insufficient representation of a fair market value for half of the coin ledgers because of

(1) the inadequacy of the auction process in general, (2) the inadequacy of the particular auction at which petitioners bought Horace's half of the coin ledgers, and because (3) the nature of the Brand Archive was not fully understood in 1983. He believes that, in 1983, the full set of the coin ledgers had a "conservative" value of $150,000. To reach his opinion, Austin testified: "In the rapidly rising, serious numismatic market from 1983 to 1991 (and later), an extrapolation of three times the 1983 value is highly conservative. All other parts of the archive aside, I believe a 1991 figure of $450,000 for the ledgers alone to be a fair market value."

As to the Chicago Coin Co. papers, Austin based his valuation on a comparison to the New Netherlands Coin Co. auctioneer's books, which were sold at auction in 1991 for $20,900.

### 2. Analysis of Gabriel Austin's Testimony

We do not find Gabriel Austin's testimony helpful in determining the fair market value of the coin ledgers on the contribution date. Austin failed to convince us that the value of the coin ledgers was $450,000.

Austin's testimony was vague and he did not make it clear to us how he arrived at many of the figures he used in the various stages of his analysis. Where we do understand his analysis, it is, for the most part, unpersuasive. Austin starts with $22,550, the price petitioners paid in 1983 for Horace's half of the coin

ledgers with the accompanying half of the photocopy and a photocopy of the Chicago Coin Co. papers.  He attributes that price to Horace's half of the coin ledgers alone, without accounting for the value, if any, of the two photocopies that accompanied Horace's half of the coin ledgers.  To find the value of the complete set of coin ledgers, he tripled the $22,550 and somehow arrived at $75,000.  He doubles that figure to account for the inadequacy of the auction process in general, the unknown importance of the coin ledgers, and the inadequacy of the specific auction at which petitioners bought Horace's half of the coin ledgers.  We can understand (but do not necessarily agree with) his adjustment for the general and specific alleged inadequacies of the auction, see, e.g., Berry Petroleum Co. & Subs. v. Commissioner, 104 T.C. 584, 637-638 (1995) ("prices obtained at forced sales, at public auctions, or in restricted markets may not be the best criteria of value"), but do not understand his adjustment for the unknown importance of the coin ledgers.  Reasonable knowledge of relevant facts is part of the applicable definition of fair market value.  See sec. 1.170A-1(c)(2), Income Tax Regs.  If Austin's adjustment to take account of the unknown importance of the coin ledgers simply reflects the fact that the coin ledgers might turn out to be more valuable once their importance became known, we do not see how it affects their fair market value before their importance became known. Austin did not apportion the relative influence of the concerns

that gave rise to his adjustment leading to the $150,000 figure, nor can we. Finally, Austin multiplied the $150,000 figure by three to arrive at a 1991 value of $450,000. During his oral testimony, he explained his "highly conservative" "extrapolation" of the value of the coin ledgers from 1983 to 1991 as follows:

> I'm not sure if I've made that point clear, the calculated figure that I worked up to the $75,000. At that point, having arrived at the 150, well then you know that I took the three times figure, which I took to tell the truth without very much investigating, but it was from what I understood in the -- the talk that had been going on, the talk for a settlement in the meeting and so on, it was a figure already on the table. Well, I didn't want to start that up again.

He further describes the appreciation factor (3x), which he asserts he "borrowed" from respondent's expert, as "not really a very solid one" and states that, although it is a figure he "could argue with" (he does not tell us whether he would argue up or down), he accepted it because of time pressure and "not to argue over every comma".

Opinion testimony of experts is useful to the trier of fact precisely because it provides the informed and unbiased opinion of a qualified expert arriving at a reasoned conclusion. It would be absurd to rely on a purported expert's opinion that was, with respect to important conclusions, arrived at "without very much investigation", considered by the expert himself as "not really * * * solid", and merely a concession so as "not to argue over every comma". Therefore, we find major portions of Austin's testimony as to the value of the coin ledgers unpersuasive. He

has failed to aid us in determining the value of the coin ledgers on the contribution date, and we accord his testimony no weight.

Austin's total analysis leading to his opinion that the Chicago Coin Co. papers were worth $20,000 in September 1991 is as follows:  "These ledgers are comparable in value to the New Netherlands Coin Company auctioneer's books; they differ in being a record of an earlier period, and a record of the activities of a private company."  We fail to see the alleged correlation between the amount realized for the auctioneer's books and the fair market value of the Chicago Coin Co. papers and therefore attach little weight to Austin's opinion with respect to the value of the Chicago Coin Co. papers.

C.  Respondent's Expert

1.  Michael F. Robinson's Testimony

Michael F. Robinson (Robinson), respondent's expert witness is an appraiser and dealer in manuscripts, autographs, and rare books, who was accepted by the Court as an expert in the valuation of manuscripts and rare books.  Robinson prepared a written report that was received into evidence as his expert testimony (the Robinson report).  Robinson is of the opinion that the value of the Brand Archive on the contribution date was $75,000.  Robinson explains that $75,000 is (1) three times the price paid for Horace's half of both the coin ledgers and the photocopy ($22,550 x 3 = $67,650) plus (2) $7,350 for "the remaining papers".

We need discuss only a few significant aspects of Robinson's testimony. Robinson started with the price paid for Horace's half of both the coin ledgers and the photocopy (the Horace ledger set), determined that much of the value of the Brand Archive rests in its content, and took into account that the price for book inventories with substantial manuscript annotations approximately tripled between 1984 and 1993. By his oral testimony, Robinson made clear that, although he believed that the assembled value of the coin ledgers was more than the value of either half, he did not believe that the assembled value was double (or more than double) the value of either half. Indeed, he testified that the value was "very far" from double. Taking into account the photocopy, he explained that conclusion as follows:

> What you have here, I think, is two copies of a text, two complete copies of the text, and you put them together, and instead of having--and you still have two complete copies of the text, but one is in the large volumes and one is in the small photocopies.

### 2. Analysis of Michael F. Robinson's Testimony

Robinson's testimony was also vague. He did not explain the weight accorded to the components of his analysis that led him to triple the value of the Horace ledger set to arrive at his valuation of $67,650 for the coin ledgers and photocopy in 1991. We suspect that the tripling reflects primarily, if not exclusively, the data he had with respect to the appreciation in the price of book inventories between 1984 and 1993. We believe

that he was wrong in concluding that the assembled value of the coin ledgers could not have been double the value of either half. Assuming that the value of the Brand Archive is attributable principally to its content, as Robinson asserted, there were at least two sets of the information constituting the content of the coin ledgers in existence in 1983.  Both the purchased set (the Horace ledger set) and the set petitioners already owned before the purchase were "mixed" sets, each being one-half of the original ledgers and photocopies.  Nevertheless, petitioners paid $22,550 for the Horace ledger set, and Robinson accepts that value as being its fair market value in 1983.  If a third party had purchased the Horace ledger set for $22,550 at a public auction, we believe that the fair market value of petitioners' set immediately after the auction would also have been $22,550, based on the recent sales price of a comparable item.  Thus petitioners had two equivalent mixed sets of information that, together, by the evidence available to us, and based on Robinson's analysis, could be worth double.

D.  Discussion

In 1981, petitioners believed that Armin's half of the coin ledgers and photocopy, the Chicago Coin Co. papers, the Virgil Brand estate papers, Armin's papers, and the Jane Allen papers had no market value and, on that basis, they did not report them on the estate tax return.  Two years later, they paid $22,550 for the Horace ledger set.  We accept the implicit conclusion of the

experts that $22,550 reflects the fair market value of that purchase. For reasons we have explained, we conclude that the value in 1983 of the complete set of coin ledgers and the photocopy was twice the then value of the Horace set, viz, $45,100. We agree with what we take to be Robinson's conclusion that that value should be tripled to determine the value of the sets on the contribution date, viz, $135,300. To that, we add $7,350, Robinson's value for the "remaining papers", to arrive at $142,650 as the total fair market value of the contribution on the contribution date. Petitioners argue that we must take into account the disability of the auction sale of the Horace set and any increase in value that resulted from the enhancement of Virgil Brand's reputation. That may be so, but petitioners have failed to provide us with any basis to quantify such factors. We find that the value of the contribution on the contribution date was $142,650.

III. Conclusion

We redetermine deficiencies in tax based on our finding as to the value of the contribution on the contribution date; we determine no overpayments.

Decisions will be entered under Rule 155.